CURTIS & BARKER et al., Appellees, v. CENTRAL UNIVERSITY OF IOWA, Appellant.

**COLLEGES AND UNIVERSITIES:** Conditional Donations—Reversion. An incorporated institution, which, through its articles, promises to remain permanently under the management of a named religious denomination, may not accept a donation made on the basis of its said articles, and subsequently, even in good faith, in view of unforeseen difficulties, amend its articles and turn its institution over to a different religious denomination, and escape the enforcement of a provision in the instrument of gift for the reverting of the gift to the donors, in case of such change of management.

**CONTRACTS:** Donation to Religious Body—Violation of Conditions. Articles of donation reviewed, and held not to permit the religious institution receiving the gift to violate, even in good faith, the terms of the gift.

**GIFTS:** Rescission for Breach of Condition. Whether, under the particular terms of a gift to a religious institution, the gift would revert to the donors because of the failure to exact a bond of the financial officer of the institution, as required by the terms of the gift, *quaere*.

**CONTRACTS:** Consideration—Loss of Rights and Acquisition of Benefits. Loss of rights by one party and the acquisition of benefits by another party afford ample consideration for a contract. So held as to a series of instruments pertaining to a gift to a religious institution.

**TRIAL:** Waiver of Trial at Law. Permitting law issues, without objection, to be tried along with equitable issues, is a waiver of trial by jury.

**TRUSTS:** Merger of Legal and Equitable Title. Legal and equitable titles in the same trust property will not be held to merge, when to so hold would nullify the purpose of the parties and destroy the power to create conditions or reservations.

**TRUSTS:** Cy Pres—Inapplicability. A donee who has deliberately deprived himself of the power to carry out the conditions attached to donor's gift may not take cover under the doctrine of cy pres—conceding, *arguendo*, that such doctrine prevails in this state.

*Appeal from Marion District Court.*—GEORGE B. LYNCH, Judge.

FEBRUARY 16, 1920.

ACTION in equity to recover money set apart or donated to defendant by Curtis & Barker. The action was brought by the heirs and representatives, who claim that the money reverts to them, because of a breach of the conditions of the contract. The trial court gave plaintiffs judgment for $13,693.56, with interest from April 20, 1916, that being the amount still remaining in the hands of the defendant on that date. Defendant appeals.—*Affirmed.*

*George W. Crozier, George G. Gaass,* and *Nourse & Nourse,* for appellant.

*S. F. Prouty,* for appellees.

PRESTON, J.—Plaintiffs sued for about $52,000, the total amount of the donation. Numerous grounds were assigned originally by plaintiffs, and relied upon as constituting breach of the contract; but a part of

1. COLLEGES AND UNIVERSITIES: conditional donations: reversion.

the funds donated were used for running expenses of the university, and to pay pressing debts, with the consent of Curtis & Barker, so that appellees concede that, as to a part of the fund, there was a waiver. They also concede there was a failure of proof as to other grounds, the parties being both now deceased. Appellees now rely on three grounds, which, stated briefly, are that defendant turned over the school to the management and control of another denomination, of different faith and religious tenets; that it diverted and abandoned the school at Pella, and transferred its fund to a competing institution, located elsewhere, and did not require a bond for the safe preservation of the fund, as expressly required by the articles of donation. There is little, if any, dispute in the evidence on

the main issues. It is mostly record testimony. The defendant was incorporated under the laws of Iowa in 1853, as a corporation not for pecuniary profit, as a literary and theological institution, to promote the interests and inculcate the doctrine of the Baptist denomination, and its institution was located at Pella, Iowa. Its articles of incorporation provide, among other things:

"The name and style of this corporation shall be the *'Central University of Iowa,'* and its object shall be the establishment, holding and government of a literary and theological institution in Pella, under the particular auspices of the Baptist denomination, yet offering equal advantages to all students having the requisite literary and moral qualifications irrespective of denomination or religious profession. It shall have perpetual succession, and fill its own vacancies; establish by-laws and make all rules and regulations in accordance with law and these articles, and in general may do all acts which are necessary and proper to carry into effect the object of the corporation.

"Article 4th. Board of Trustees. The government of the university shall at all times be vested in a board of trustees which shall consist of thirty members; and one third of whom and not more than one half shall be ministers of the Baptist denomination in good standing and full fellowship, and twenty-four at least members of the Baptist church in good standing and full fellowship.

"Article 5th. Classes of Trustees. The board of trustees shall be divided into three classes to be numbered 1st, 2d, and 3d. The term of the first class shall expire in one, the second in two, and the third in three years from date and the members of any class may be eligible to re-election.

"Article 7th. Future Election. Hereafter all elections to the board of trustees shall be made from year to year by the trustees themselves, and elections always to be made by a ballot vote of three fourths of the members present at

the annual meeting convened by due notice three months before the time.

"Article 8th. Officers of the Board. The board shall choose from its own members annually and as often as may be necessary a president of the board, a vice-president, a secretary, a treasurer and three other members who together shall constitute an executive committee whose duty it shall be to carry out the design of this incorporation in accordance with the provisions of these articles and the laws of Iowa.

"Article 9th. Amendments. The board of trustees shall have power at any regular meeting to amend these articles provided due notice shall have been given to all the members of the proposed amendment and it shall pass by an affirmative vote of a majority of the board, except that part of Article 2d which defines the object of this incorporation, and that part of Article 4th which requires 24 of the members of the board to be members of the Baptist churches and which parts shall be unalterable."

Later, the articles of incorporation were renewed for 50 years from 1893.

For a good many years prior to 1916, and, as we understand the record, as early as 1881, propositions had been pending at intervals, and efforts made to abandon the school at Pella, and move it to Des Moines. In 1915, the board of education of the Northern Baptist Convention had a meeting in Chicago, at which they requested the Reformed Church in America to take over the defendant university, and meetings were afterwards held to consider the matter. A witness testifies:

"I do not know how often, since I was elected treasurer, in 1900, down to 1916, that either the Des Moines Baptist College or the educational board of the Northern Baptist Convention stirred up this question of turning over the assets, or part of them, but quite frequently.

"Q. Is it not a fact that they were constantly agitating that question, that Pella turn over these assets to Des Moines College, or the educational board, and cease its operation?  A. Well, they did not put it in that broad statement.  Q. They were more polite about it?  A. They were quite diplomatic.  Q. Was that the substance of what they asked you?  A. That was the substance of it.  Q. What is the fact as to whether or not, during those years down to 1916, you resisted that influence?  A. We did; strongly.  Q. What is the fact as to whether you understood this arrangement in 1916 to be practically an order from the Northern Baptist Association, or educational board, to turn over those things?  A. Yes, sir."

The Northern Baptist Association is a suggestive body, not a governing body. But it is the highest body of the Baptist church in the north. It appears that both H. G. Curtis and E. G. Barker, constituting the firm of Curtis & Barker, were students at the Central University at the time of the breaking out of the war, and enlisted in the army. At the close of the war, Curtis returned to the university, and completed his education. Then Barker engaged in farming. Curtis was a lawyer. Both were deeply interested in the school, and were active in its upbuilding. They made many contributions, prior to the one in controversy. It is claimed by plaintiffs that Curtis & Barker were aroused by the talk of removal, and conceived the idea that they would donate shares of stock in a silver mine, an enterprise in which they were engaged. At any rate, on August 26, 1881, Curtis & Barker made a written proposal to the defendant university, as follows:

"In consideration of the love and affection for our Alma Mater, we the undersigned, hereby agree that we will set apart and donate for the use and benefit of the Central University of Iowa, at least 60,000 shares of the capital

stock of the Plomosa silver mine, situated in the state of Sonora, republic of Mexico.

"And we further agree, in order to make the same available and valuable to the university, that we will cause the sale of so much of said stock as shall seem advisable after consultation with the chancellor of the college, and turn the net proceeds to the use of the school.

"The said donation by us to be for such special professorships or work or fund or purpose and on such reasonable conditions as we may name when formally presented to the board.

"And the same to be taken and accepted in lieu of and in full discharge of all our obligations to the university, in other words, all former donations and obligations to be deducted from the total amount otherwise covered by this gift and are canceled hereby.

"We further desire to say that we regard this property mainly as dedicated to the university and desire only to retain such an interest as will, when the mine is developed, enable us in common with those who invest, to reap some benefit from the enhanced value and of the proceeds to cover actual expenses of placing the mine, working the same before company is organized and to cover all expenses on account of the mine previous thereto and time spent in reference thereto.

"And of the balance, if any, we will be still mindful of the needs of the college and act as we are prospered in the enterprise with the same liberality with which the foregoing plan and purpose is seconded by the other friends of Christian education and of the Central University.

"Trusting that all our efforts herein may be eminently successful.

"It is further understood and agreed that at least $30,000 shall be applied to the college funds from the sales of the first 50,000 shares."

It does not appear that there was any formal acceptance of this proposal by the university, but counsel for both sides concede that it acquiesced therein. The sale of stock was begun soon after this, and about $11,800 was realized from the disposition of stock, and turned over and used by the university in payment of running expenses and debts, prior to the written instrument, dated September 10, 1883, executed by Curtis & Barker, as follows:

"Conditions of the Curtis and Barker donation to the Central University of Iowa.

"Know all men by these presents that we the undersigned, H. G. Curtis and E. G. Barker for and in consideration of the love and affection we bear our cherished Alma Mater, the Central University of Iowa, have made and by these presents do make and confirm unto said Central University of Iowa, a donation to the permanent fund thereof of the net sum of forty-eight thousand five hundred and nineteen dollars and ninety cents ($48,519.90) in cash and good notes accepted by the chancellor thereof and the sum of three thousand three hundred and ninety-four dollars ($3,394.00) in stock of the Plymosa Mining Company, valued at two dollars ($2.00) per share making a total of fifty-one thousand nine hundred and thirteen dollars and ninety cents ($51,913.90) all now in the hands of the chancellor which is donated upon and subject to the following express terms and conditions by the donors and to be formally placed in the treasurer of the college on the acceptance of the same with the conditions, by the board of trustees.

"I. The said sum to be a part of the permanent fund of the college to be known and designated as the Curtis and Barker fund shall be kept distinct from the other funds of the college, and the principal sum to be sacredly held and no part of it to be in any manner consumed by or for the use of the university and in no case shall it be liable for the debts, defaults, liabilities or obligations of the uni-

versity nor of the donors, but shall be kept on interest well secured and the interest may be used for the benefit of the school.

"II.    The said university shall under no pretence ever be removed from the city of Pella in Marion County, Iowa, but shall be kept and maintained there.

"III.    After the A. D. 1885 the work of instruction done and actually maintained and performed in and by said university in its several college departments must be as good as and in all respects equal to the average college work in the colleges of Iowa.

"IV.    Curtis and Barker shall each have the right to nominate the occupants of the chairs bearing their names respectively, subject to the approval of the board of trustees by confirmation.

"V.    Curtis and Barker shall have the right to name each chair which is endowed in whole or in part by the said funds so contributed by them and they may designate what chairs shall be benefited thereby and the amount to be applied to each but less than five thousand dollars ($5,000.-00) applied to one chair shall not give the right to name the chair, and until such designation is made by them the fund may (or the income therefrom rather) be used for the benefit of the whole school or faculty as the board of trustees shall deem best for the general good.

"VI.    The safe-keeping of this fund being of prime importance to all parties, the board of trustees shall have a special watchful and advisory care of it and are enjoined to exercise special vigilance and to this end shall also require of the officers and agents who have the custody and investment thereof a bond or bonds in a penalty or amount deemed sufficient by the executive board to secure the whole amount liable to come into their hands with good and sufficient sureties to be approved by the board conditioned upon the faithful performance of their duties in all respects

touching said fund, said bond to run to the university and to be for its benefit or the benefit of Curtis and Barker as their interests may appear.

"VII. Said donors or either of them, their representatives, agents or attorneys shall have the right to an inspection of the books and vouchers relating to said fund at any time and full statements of the condition of the funds shall be rendered Curtis and Barker once a year or oftener if demanded. The said fund shall be kept in a separate account from the balance of the funds of the institution and losses if any occurring through the neglect, fault or miscarriage of any of the officers or agents of the institution or otherwise shall be made good to this fund by the university so far and to the extent that it is able to do so and its assets that may be legally used for such purpose will allow.

"VIII. Approval is hereby given of the loan of seven thousand five hundred dollars ($7,500.00) of said funds while in the hands of the chancellor and before covered into the treasury of the university to the Plomosa Mining Company and that the notes and securities given by said company shall be and hereby are accepted and considered as part of this fund and shall be held by the college instead of cash received by the chancellor and when paid by said company shall then be subject to all conditions herein and this condition and disposition of so much of this fund is an express condition of this donation by the donors.

"IX. The income from dividends on the said Plomosa stock (viz., the three thousand three hundred and ninety-four dollars $3,394.00) shall be held and be disposed of the same as interest on loans and the proceeds from stock hereafter sold shall be a part of said fund and be subject to the same conditions but shall not be sold except with the consent of the donors.

"The foregoing amounts being in full of the proposed

donation of Curtis and Barker of proceeds of sixty thousand shares of Plomosa mining stock.

"The failure to comply with any of the foregoing conditions or in the execution of any of the aforesaid trusts in good faith reasonable consideration being made for unavoidable delays and unforeseen contingencies shall work a forfeiture of the said fund and the whole thereof shall be at once the property of Curtis and Barker upon the declaration of said failure by them or either of them and shall be payable to them, their heirs, representatives or assigns, but shall not in any case be liable to any creditors of the donors or either of them."

These conditions were accepted by the university on September 10, 1883.

The institution continued in full control of the Baptist denomination until about June 6, 1916, when, as plaintiffs claim, the property in controversy and the buildings were turned over to the control of the Reformed Church in America, and the remainder of its property was turned over to the American Baptist Educational Society, to be used in connection with the property of the Des Moines College, in establishing and endowing the Central College, a Baptist institution, located at Des Moines, Iowa.  The Reformed Church of America has a central body—the Presbyterian system of government.  Its teachings are not the same as the Baptist Church.  The Baptists have no higher body to which they are responsible.  The Dutch Reformed church in America and the Baptist church are separate organizations.  There was turned over to the Northern Baptist Association $5,000 in securities and over $100,000 in individual subscription notes, part of them to the endowment fund. All the notes that were held by the Central University, except the Curtis & Barker fund, were so turned over.  Later, and upon the amendment of the articles and the turning over of the said funds, the defendant university proceed-

ed to raise another endowment fund, and, since 1916, $96,-000 has been raised, or subscriptions therefor, and the total fund, including the Curtis & Barker fund, is $110,000. This $96,000 was raised principally through the constituency of the Reformed Church of America in different parts of the country. On the date last given, to wit, June 6, 1916, defendant, for the purpose of effectuating the change of property and control of the institution, as plaintiffs contend, undertook to amend the articles of incorporation, so that the Reformed Church in America would have absolute control of the institution. They first amended by striking out the provision in the original articles, which were unalterable, and then, in later articles of the same instrument of amendment, substituted other provisions therefor. The amended articles, so far as now material, are as follows:

"1st. That Article eleven (11), be amended by striking out the following, 'except that part of Article Two (2) which defines the object of this corporation, and that part of Article Four (4) which requires twenty-four (24) of the members of the board to be members of the Baptist churches, and which shall be unalterable.' So that said Article Eleven (11) when amended shall read as follows: 'The board of trustees shall have the power at any regular meeting to amend these articles, provided due notice shall have been given to all members of the proposed amendment, and it shall pass by an affirmative vote of a majority.'

"2d. That Article Two (2) be amended by striking out the words 'Baptist denomination' and inserting in lieu thereof the words 'The Reformed Church in America,' so that Article Two (2) when amended shall read as follows: 'The name and style of this corporation shall be the Central University of Iowa, and its object shall be the establishment, holding and government of a literary and theological institution in Pella, Iowa, under the particular auspices of

the Reformed Church in America, yet offering equal advantages to all students having the requisite literary and moral qualifications, irrespective of denomination or religious profession.'

"3d. That Article Four (4) be amended by striking out the words, 'one quarter of whom, and not more than one half, shall be ministers of the Baptist denomination in good standing and fellowship, and twenty-four at least members of the Baptist churches in good standing and fellowship,' so that said Article Four (4) when amended shall read as follows: 'The government of the university shall at all times be vested in a board of not more than sixty-five (65) nor less than fifteen (15) trustees, of whom the president shall be a member ex officio, and a majority of whom shall be members of the Reformed Church in America, in good standing.' "

On April 20, 1916, plaintiffs made formal written demand for a return of the fund known as the Curtis & Barker fund, under the instrument entered into September 10, 1883, and later, in writing, specified the grounds wherein it was claimed that defendant had failed to comply with the terms and conditions of the contract. Among these grounds were the three before set out, and now relied on.

The board of trustees is now under the control of the Reformed Church of America. The president of defendant university is of that denomination, and nearly all of its professors. For some years before this, the professors were not all members of the Baptist church, nor were all of the trustees of that faith. It is being conducted and supported by the Reformed church, to teach the tenets and advance the cause of that church. The buildings and equipment still remain in Pella, and a university has been maintained and operated, under the conditions before stated.

For a better understanding of the situation, some other circumstances should be stated, and it may be that still

others may be referred to later, when considering the different points argued. It further appears that H. G. Curtis was elected a trustee of defendant university in 1870, and was continuously re-elected, and served as such until his death, in 1901, and his widow was elected to fill his last unexpired term, and she was re-elected for the term ending June, 1906. She died in 1904. Mr. Curtis acted for some time as a member of the executive committee of the board of trustees, and served on various committees, including the finance committee. He was vice-president for a time, and to some extent acted as attorney for the university. He removed to Atlantic in 1875, and practiced law there, and was away from Pella a considerable part of the time, for a time in Massachusetts, and for some years in Mexico, engaged in mining. E. G. Barker was elected a trustee in 1874, and served until 1910. He also acted as a member of different committees. He died after this suit was commenced. He made his home in Madison County until about 1890, except a year or two, when he was in Colorado. He lived in Des Moines, after returning from Colorado, and sent his children to the Des Moines College, the Baptist college referred to, for six or seven years after 1890. At the various annual meetings of the trustees, the treasurer made reports, showing the condition of the various funds, including the Curtis & Barker fund, which reports were referred to an auditing committee of the board of trustees. Mr. Vanden Berg was elected treasurer in 1900, and continued in that office until the time of the trial. He was not under bond. He says the trustees did not require him to give bond. As treasurer, he was continuously in charge of the Curtis & Barker fund, during all said time, and was in charge of it at the time of the trial. He says he was willing to give bond, had it been required. The trustees who acted from 1881 to 1884 are dead.

1. Appellees contend that there has been a diversion of

the trust, and of the purposes and intentions of Curtis & Barker, who contributed the fund in question, which is equivalent to and has the effect of an abandonment, even though the buildings remain, and a college is still conducted, under different control; and further, that the articles of incorporation, as they existed at the time of the donation in question, together with the terms of the donation and the acceptance thereof by defendant, constitute a contract. We consider these the more important questions in the case. They cite the celebrated case of *Trustees of Dartmouth College v. Woodward*, 4 Wheat. 518 (4 L. Ed. 629). They quote from that case as holding that the contract could not be changed, because the change is not according to the will of the donor, and is subversive of that contract on the faith of which the property was given. They contend that the instant case is stronger in its facts than the case cited, for that there, there was no express provision in the charter preventing its amendment; while in the instant case there is an express provision preventing changes as to the purpose and control in the articles of incorporation of the defendant. In the note in 4 L. Ed. (2d Ed., Extra Ann.) at 910 (1 Rose's Notes [Rev. Ed.] 957) it is said of that case:

"Even a casual exploration of the perplexing labyrinth of subsequent cases wherein its holdings have been applied or distinguished, according as a given state of facts has seemed to necessitate judicial acquiescence or evasion, will leave one profoundly convinced of the entire applicability of these terms ['the great case of Dartmouth College v. Woodward']."

And further, at page 958, that:

"Most familiar among the principles deemed to have been laid down by the college case is the proposition that a corporate charter is a contract, within the protection of the Federal Constitution. It would seem strange that the

courts should still be discussing this simple doctrine. Surely, it will be said, three quarters of a century should suffice to establish and define the application of so plain a proposition."

Some cases are given in the note where the cited case has been distinguished. Plaintiffs also cite the case of *Associate Alumni, etc., v. General Theo. Seminary, etc.*, 26 App. Div. 144 (49 N. Y. Supp. 745), as in point. In that case, the alumni undertook to raise a fund to be donated to the college, which was donated under certain terms as to its use. The college accepted the fund, and used it in accordance with the terms of the donation for several years; but, after ineffectual negotiations to modify the conditions, the college sought to disregard the conditions and to use the fund according to its own direction. The court said:

"But it is urged by the defendants' counsel that the alumni never had any interest in or to this fund; that the fund was derived from contributions made by individuals for the purpose of promoting a specific part of the defendants' work, and that, therefore, defendant was entitled to take, hold, use, and apply the fund and income therefrom to this work, irrespective of the wishes of the association; that there was no consideration for the limitation imposed on the exercise of this right by the defendant; that the fund did not belong to the association, and that, therefore, it parted with nothing on the faith of defendants' agreement, or its assent to the conditions imposed when the fund was transferred. We are at a loss to understand how the defendant could believe or hope that its contentions in this respect would receive the sanction of any court. Honesty and fair dealing requires, when one person has received property from another, under an agreement that he will do something with it, that he should do as he agreed, or else return the property to the one from whom he received it. The fund was offered to the defendant by the associa-

tion on certain conditions. . The defendant, in order that
it might receive the fund, assented to those conditions, and
agreed to be bound by them. It cannot now be heard to
say that the association has no title to, or interest in, this
fund. If it desired to make such claim, it should ha·
done so when the fund was offered, and not after it had
obtained possession of it."

But, on appeal in that case, the judgment was modi-
fied. See *Associate Alumni, etc., v. General Theo. Sem.,
etc.*, 163 N. Y. 417 (57 N. E. 626). In that case, however,
there was no provision that the fund should revert, and
the court expressed no opinion on that question. The con-
dition alleged to have been violated was in regard to the
character of the professorships, and the right of donors to
nominate. The court decreed specific performance, and that
the purposes of the trust should be·carried out. There was
no abandonment or diversion to the extent that the pur-
poses of the donors could not be carried out. The court
did say, however, in that case, that a trust might entirely
so fail, because the purpose for which it was created, be-
came impossible of accomplishment, that the fund ought to
be returned to the donor. They cite, also, 1 Beach on
Trusts and Trustees, Section 349, as follows:

"Where a charitable trust has been created, and the
object of the trust unequivocally designated in the convey-
ance, it cannot be changed, as a matter of convenience, or
with a view to increasing the value or usefulness of the
charity, even by the consent of all the parties in being. In
a case relating to the establishment of a divinity school in
connection with Harvard, and where relief was sought by
the corporation of the college, it was held that this court
cannot, in the exercise of its chancery jurisdiction, with-
draw funds given by individuals to the corporation of Har-
vard College, in trust for the promotion of a theological edu-
cation at the college, or for the benefit of a divinity school

attached to the college, and entrust them to an independent board of trustees, to be applied to the support of a divinity school not connected with the college, merely on the ground of inconvenience and embarrassment in continuing the connection between the college and the divinity school."

We do not understand appellant to dispute this legal proposition. Its defenses are on other grounds. It contends that, under the evidence, there has been no abandonment, because the buildings still remain in Pella, and a college is being maintained, and under the same name. Defendant further contends that there is no provision for forfeiture in case of change of denominational management or auspices, when it is done in good faith, because of unforeseen contingencies; that the instrument of date September 10, 1883, in so far, at least, as its forfeiture clause is concerned, is without consideration, and that it did not change the prior proposal of donors; that, where the trustee and the *cestui que trust* are the same, the title merges; that equity will not enforce a forfeiture, and that the failure of the treasurer to give bond, under the circumstances, is not sufficient ground upon which to decree a forfeiture.

We think the trial court rightly held that the fund reverted, because of the violation of the contract by the defendant. By the amendment to the articles of incorporation, and the transfer of the funds and the control to other institutions, the purposes, or one of the main purposes, of the original articles of incorporation of the school, and of the donation, were abandoned. It was no longer a Baptist school, and no longer under the control of the Baptist denomination. The donation clearly creates a trust, which required that the principal should be held intact, and the interest used. It was to be held as a permanent fund. To determine the nature and scope of the work, we turn to the charter, and the terms and conditions of the donation. The charter created a Baptist institution, and provided that this

purpose could not be changed; that it was to be unalterable. The donors desired two things: First, that this college should remain under the control of the Baptist denomination; and second, that it should not be removed from Pella. It was unnecessary that the contract or conditions of the donation should refer to the former, because that was covered by the articles of incorporation. There was no express provision in the charter that would prevent the removal of the school from Pella. This was covered by the conditions, which provide that the institution should not only be kept at Pella, but that it should be maintained there. It seems to us that it is not material whether the change was made by the defendant itself, on its own volition, or whether it was done at the suggestion of the Northern Baptist Association. The defendant did, itself, by its trustees, make the changes in the articles, and turned over the endowment fund and the control. The trust was violated, and the purposes and intentions of the donors of this fund frustrated; and this is so, even though defendant and its trustees may have considered that they were acting for the best interests of the college itself, under the new management. It may be true, as contended by appellees, that the fund would revert to Curtis & Barker and plaintiffs, as their successors, without the clause in the instrument so providing, because the fund is being used for a purpose for which it was not designed. But it seems to us unnecessary to discuss this question, because there is a provision in the writing providing that it shall revert. In *Starr v. Morningside College,* 186 Iowa 790, we had a case where plaintiff sought to recover a fund because of the alleged breach of conditions. That case was different from the instant case in this: that there was no condition in the gift that the college should remain at Charles City, and, upon a merger with another institution, the purposes and the intention of the donor were being carried out.

2. It is thought by appellant that no forfeiture is provided for change of denominational management, if done in good faith and because of unforeseen contingencies, which are provided for in the contract. It is not contended by appellees that they are asking a forfeiture, strictly speaking, but that the fund reverts because of the breach of conditions. The contract, or conditions of the donation, provide that:

2. CONTRACTS: donation to religious body: violation of conditions.

"For failure to comply with any of the foregoing conditions, or in the execution of any of the aforesaid trusts, in good faith, reasonable consideration being made for unavoidable delays and unforeseen contingencies, shall work a forfeiture," etc.

It will be noticed that the failure to comply with any of the foregoing conditions shall work a forfeiture. The latter clause, we think, had reference to other matters, and that the parties did not contemplate that the fund itself could be converted to another use. The donation provides that, after 1885, the work of the university must be as good as and equal to the average college work in the colleges of Iowa; also the naming of professors, and the endowment of chairs, etc. It seems to us that the reference to unavoidable delays and unforeseen contingencies applies to such last-named matters. The fund was to revert upon two conditions: First, the failure to comply with any of its conditions; and second, the failure in the execution of the trusts upon which the funds were given.

3. As to the failure to give bond, it is true that, under the record, the trustees did not require the treasurer or the party in charge of the fund to give bond. It may be that the treasurer would be excused, but it was the duty of the trustees to require bond. It is thought that this is a harmless breach, in that the fund is intact, without giving a

3. GIFTS: rescission for breach of condition.

bond. That may be so, up to this time; but, if appellant's contention should be sustained, that there is no reverter, and that the trust should continue in the future, the giving of a bond would doubly secure the fund. It may be that this is not of as great importance as some of the conditions, yet, as said in *Moran v. Moran,* 144 Iowa 451, 463:

"The donee is under no compulsion to accept the gift. He is free to elect. The question he has to decide is the ordinary one which arises in nearly every business transaction—whether the thing offered him is worth the price demanded. He may attach to his offer such lawful conditions as his reason, caprice, or malice may dictate, but he is dealing with his own, and the donee, who claims the benefit of the gift, must take it, if at all, upon the terms offered."

See, also, *Miles v. Miles,* 168 Iowa 153, 161; *Rogers v. Law,* 66 U. S. 253.

4. It would seem that there was sufficient consideration. The donors parted with rights, under the instrument of September, 1883, and the college acquired benefits. It may be true, as contended by appellant, that said instrument does not change the prior proposal. The first instrument was but a proposal, and it recites that the donation is upon such conditions as they may name when formally presented to the board. The later instrument simply carries out the provisions of the proposal, and is the final and real contract.

4. CONTRACTS: consideration: loss of rights and acquisition of benefits.

5. Appellant's next proposition is that equity will not enforce a forfeiture. Under this head, it argues further that defendant, in its answer, pleaded that plaintiffs have a plain, speedy, and adequate remedy at law. The plaintiffs asked an accounting, so that the action was properly brought in equity. There was no motion to transfer the cause, or any issue, to the law side. It was tried as an

5. TRIAL: waiver of trial at law.

equitable action. Appellant quotes a definition of forfeiture as "A punishment annexed by law to some illegal act or negligence." As before said, this is not so much a question of forfeiture as it is to enforce the terms of a contract which has been violated. The donors had the right to attach conditions to the gift, and the courts will grant relief for a breach, even though, as contended by appellant, it is a condition subsequent, which is to be strictly construed. Appellees contend that it is not a case of condition subsequent at all, but is for a breach of an express provision in the contract.

6. It is argued by appellant that, where the trustee and the *cestui que trust* are the same, the title merges, and they cite *Swisher v. Swisher*, 157 Iowa 55, 62, and cases from other jurisdictions. Appellees seem to concede that this is the rule, and it is the rule in some cases. But appellees contend that the trustee and the *cestui* are not the same, because the trustees held the fund for the benefit of the college and the donors, under the express terms and conditions of the contract. They cite 39 Cyc. 244, as laying down the rule that an estate or interest in the trust property may be reserved, or result to the creators by virtue of the provision of the instrument declaring the trust. In the *Swisher* case, the same person holding the legal title as grantee in a deed was also made trustee for his own benefit, so that there was a union of the legal and equitable title in the same person, and other such circumstances. There was nothing left outstanding upon which the trust or delegated power could operate. But it does not necessarily follow that, under all circumstances, the union of the two estates, even if there is such a union in this case, works a merger. If there is a reason for keeping the estates separate, or if it is necessary to do so to carry out the purposes and intentions of the donors, equity will prevent a

6. TRUSTS: merger of legal and equitable title.

merger. *Sherlock v. Thompson,* 167 Iowa 1, 11. Here, the instrument making the donation and stating the conditions thereof reserved in the donors an interest and created a trust for the benefit of the college and for their own benefit. To hold that there was a merger would nullify the purposes and intentions of the donors, and destroy the power to create conditions or a reversion.

7. It is thought by appellant that plaintiffs have waived the breaches complained of by acquiescence, negligence, and otherwise, and that their cause of action is stale. As said, appellees concede that there has been a waiver as to a part of the fund, but we see nothing in the record to indicate a waiver as to the fund now on hand, and for which a recovery was allowed. Appellees acted promptly, after the articles of incorporation were amended, the property transferred, and the purpose of the donors changed.

8. There is some suggestion in the arguments in regard to the doctrine of cy pres. We do not understand appellant to rely on that, and there is no brief point on that subject in appellant's brief. The argument at this point is mainly by appellees. Under such circumstances, we shall refer to the question but briefly. Appellees cite *Filkins v. Severn,* 127 Iowa 738, *Miller v. Chittenden,* 2 Iowa 315, *Grant v. Saunders,* 121 Iowa 80, to sustain their claim that the doctrine is rejected in this state, and that defendant may not take this property and divert it to the building up of an institution controlled by the Reformed church, contrary to the conditions imposed by the donors. They quote from the *Chittenden* case as follows:

7. TRUSTS: cy pres: inapplicability.

"If the intention of the donor can be legally executed, * * * it will be done, but if this cannot be accomplished, the claim of the heir will not be defeated by appropriating the property to another and different object."

Whether or not the doctrine has been rejected, we

think it does not apply in this case. The rule, as stated in some of the cases, is:

"The doctrine of cy pres with reference to charitable trusts in that, where a definite function or duty is to be performed which cannot be done in exact conformity with the plan of the person who has provided therefor, such function or duty will be performed with as close approximation to the original plan as is reasonably practicable." See note to *Hadley v. Forsee*, 14 L. R. A. (N. S.) 49, at 59; *People ex rel. Smith v. Braucher*, 258 Ill. 604 (47 L. R. A. [N. S.] 1015, 1021).

It occurs to us that defendant, having voluntarily put it beyond its power to carry out the purposes of the donors as to the denominational control of the college, is not in a position to ask that this fund be disposed of cy pres. We do not understand that defendant is asking that; neither is anyone else. If that were done, defendant might be required to turn it over to some other institution, such as defendant was before the change. There is no other such institution at Pella to which it could be turned over. The conditions require that it shall be maintained at Pella. The fund is retained by the defendant for purposes other than intended by donors, and contrary to the conditions of the donation. In *People v. Braucher*, supra, it was held that the court cannot, upon abandonment of the use of church property purchased by funds donated by members of the society, and its attempted sale by the surviving members of the congregation, require the application of the proceeds cy pres, if no other organization or society exists which has the same purposes and religious belief as the society to which the property belonged.

We are of opinion that the trial court rightly decided the case, and the judgment is, therefore,—*Affirmed.*

WEAVER, C. J., EVANS and SALINGER, JJ., concur.