LOUISE C. LUPTON et al., Trustees, Appellants, v. LEANDER CLARK COLLEGE et al., Appellees; LOUIS LUPTON et al., Interveners, Appellants.

**CHARITIES: Reversion of Title.** Title to property given in trust to an educational institution, on condition, among other things, that the name of the institution be changed to that of the donor, and the trust be forever maintained, does not, upon the institution's becoming unable to support itself, and consequently unable to longer exist and function as an educational institution, *ipso facto* revert

to the donor or to his estate, in the absence of a provision to that effect in the articles of trust, when it can be determined from the articles of trust and attendant circumstances that *the dominant purpose of the donor was to make a gift for the general furtherance of education.*

Faville and De Graff, JJ., dissent.

*Appeal from Tama District Court.*—James W. Willett, Judge.

April 4, 1922.

Rehearing Denied December 15, 1922.

Both plaintiffs and interveners appeal from the finding and judgment of the court below, sustaining general equitable demurrers to their respective petitions.—*Affirmed.*

*C. H. Walters, Grimm, Wheeler & Elliott,* and *F. C. Duncan,* for appellants.

*Struble & Stiger* and *Deacon, Good, Sargent & Spangler,* for appellees.

Arthur, J.—This is an action to recover of the defendant Leander Clark College the sum of $50,000, with accumulations, representing a donation of the principal sum by Leander Clark, a resident of Toledo, Iowa, to said defendant, to aid in the establishment of a permanent endowment fund of defendant college. Leander Clark died testate in 1910. After disposing of certain specific bequests to various persons in his will, he devised and bequeathed the residue and remainder of his estate to Louise C. Lupton, J. L. Lupton, and John Meisner, as trustees of the "Leander Clark estate," providing that said trustees should have and hold the trust estate for a designated period, and pay one half of the net income therefrom to Louise C. Lupton, one of the trustees above named, and should use and expend the remainder of the net income for "the benefit, comfort, maintenance, and education of the heirs of the body of said Louise C. Lupton," and that the remainder should go to the surviving

heirs of her body. The plaintiffs are the trustees named in said will, and intervener Louise C. Lupton is the daughter and sole heir at law of deceased, and the guardian of her minor children, beneficiaries of the residuary estate.

The petition of plaintiffs, which was apparently so drawn as to invite a demurrer, is adopted by the intervener, and made a part of the petition of intervention. It appears from the allegations there that, some time prior to 1881, a corporation was organized under the laws of Iowa, by and under the auspices of a religious denomination known as the United Brethren in Christ, for the establishment at Western, Iowa, of an educational institution to be known as Western College; that, in 1881, Western College was moved to Toledo, Iowa, where it was maintained and conducted as an institution of general education, under the above name, until in 1903, when its trustees, as a part of a plan to raise a permanent endowment, proposed to the public that the college would be given the name of anyone who would donate $50,000 to said fund. Leander Clark, long a wealthy resident of Toledo, who had previously made contributions to the support of the college, made a proposition in writing to its board of trustees, accepting the proposal of the college and offering to donate the sum of $50,000 for the purpose of laying the foundation of an endowment of $150,000, upon terms and conditions fully set forth in his written proposal, which, in substance, was as follows:

"I have lived in Toledo for many years, have seen the college established here, have watched with interest its varying fortunes, and have observed the benefits it has conferred upon the community and upon the church under whose auspices it is managed, in providing the means of a good education to many who would otherwise have been deprived of such advantages, and I have from time to time contributed to its support, believing that in so doing I was aiding a worthy cause. And now that the burden of debt has been lifted, it is my opinion that the next necessity of the institution is an ample, permanent, and well guarded endowment."

He further stated that, to encourage the raising of an endowment fund, he had concluded to accept the proposition made, and to donate the sum of $50,000. Among the terms and con-

ditions included was that the sum should be payable in cash or notes bearing interest at not less than 5 per cent per annum, payable annually, and secured by first mortgage on clear and unincumbered farm lands, worth twice the value of the sum secured: this, however, upon the further condition that the college or its friends secure an additional donation to said endowment fund, of $100,000 in cash or notes bearing interest at not less than .5 per cent and secured as above stated,—the whole of said additional sum to be raised and paid or secured to the college on or before January 1, 1906. Upon payment of the said $50,000 to the college, he required the board of trustees to make provision, by proper amendment to its articles of incorporation, for changing the name of the college from Western to Leander Clark College. The said instrument further recited:

"The whole of said sum of $150,000 shall constitute a permanent endowment fund, the principal of which shall be protected and forever held sacred as such, and no part of it shall ever on any pretense, or in any emergency, be pledged or hypothecated for any purpose, or temporarily or permanently loaned to any other fund of the college, but it shall be kept at interest at .the best rate obtainable, and secured only by first mortgages on clear and unincumbered farms or lands worth twice the amount secured thereby, and the board of trustees shall establish and continue in perpetual operation the proper agency for keeping said fund fully and securely loaned as herein contemplated."

The concluding paragraphs of the written proposal are as follows:

"In conclusion I desire to state that my purpose in making this proposition is to encourage the friends of the college to rally to its support and to aid in establishing it upon a financial foundation that will be enduring. It is my opinion that men of wealth will more readily contribute to a fund which is so safeguarded as to be a means of good forever, than to one which by some possibility may be lost or diverted.from its original purpose. With the double view, therefore, of making sure that my own contribution shall be forever held sacred to its purpose, and of encouraging others to join with me in raising a fund which will insure the college not only temporary relief but per-

petual prosperity and efficiency, I have deliberately provided that the whole sum of $150,000 contemplated by this proposition shall be in funds of certain value, and that, when raised, they shall be invested and managed with the utmost care and wisdom. I have deemed these closing remarks expedient for the purpose of explaining the good faith of this proposition to such as may not have considered so fully as I have done, the necessity of guarding against the diversion of an endowment fund to other uses, and thus in the end defeating the object of the donor.''

Time was made of the essence of the offer, which was to become void if the college or its friends failed to raise the additional sum of $100,000 on or before January 1, 1906. It further appears from the allegations of plaintiffs' petition that, some time prior to April 23, 1919, Leander Clark College, becoming unable to support and maintain itself as an independent educational institution, entered into negotiations with Coe College, an educational institution duly incorporated under the laws of Iowa, and located in the city of Cedar Rapids, for the association or merger of the two institutions and the transfer by Leander Clark College to Coe College of the $150,000 endowment fund. After all arrangements for the association or merger of the two institutions and the transfer of the funds had been fully completed, but before said sum had been actually transferred or delivered to Coe College, plaintiffs commenced this action in equity, which was followed by the filing of a petition in intervention, as already stated, to recover the $50,000, with accumulations, if any, alleging a breach of the contract under which the donation was made, and that, by the failure of the trustees and officers of Leander Clark College to maintain and continue to operate the college at Toledo under the above name, the said donation became forfeited and reverted to the estate of Leander Clark, and should be paid either to the trustees named in his will or to his heir at law or to the legatees named in said will.

A temporary injunction was granted by the court below, and continued pending this appeal, restraining the defendants from transferring the fund to Coe College. The sole grounds upon which plaintiffs and interveners seek to prevent the transfer of the $50,000, with accumulations, to Coe College are that

defendant Leander Clark College breached its contract with the donor when it ceased to exist and function as an educational institution under the name of Leander Clark College; and that, when it terminated its existence, the said sum became forfeited, and reverted to the estate of the donor. Coe College was joined as a defendant some time after the original action was begun; but, in view of the conclusion reached, we need give no particular consideration to the claims of this institution. The demurrers filed to plaintiffs' petition and the petition of intervener were filed on behalf of both the defendant Leander Clark College and Coe College.

Manifestly, plaintiffs have no such interest in the subject-matter of this controversy as that they may maintain an action to enjoin the proposed association or merger of the two institutions or the transfer of the endowment fund by the one to the other, unless there has been a forfeiture or breach of the alleged contract which resulted in the reversion of the fund to the estate of the donor. In other words, it is a matter of no concern to plaintiffs or to interveners whether or not the proposed arrangement between the boards of trustees and other officers of the two institutions is one that a court of equity, in the exercise of its broad chancery powers, would authorize or direct the trustees to make. Apparently the alleged arrangement was entered into by the trustees of Leander Clark College without the aid or intervention of a court of equity.

On the other hand, it is the contention of counsel for appellees that the fund donated was either an absolute gift to the college or a gift to the cause of Christian education, which a court of equity, in the exercise of its broad equitable powers, will carry out and enforce in such a manner as will effectuate the intention of the donor.

It is to be observed that the written proposal in which the terms and conditions of the donation were fully stated contains no provision for a forfeiture or reversion of the fund to his estate, nor does it provide for any other disposition thereof, in the event that Leander Clark College should cease to exist and function as an institution of learning. Gifts of the character in question for the promotion of education come within the acknowledged definition of gifts to charity, and the first impor-

tant question in dealing therewith is to ascertain the true intention of the donor. This intention must be found from the instrument itself, and the facts and circumstances surrounding its execution and the making of the gift. It would, of course, have been proper for the donor to have provided for a forfeiture and for a reversion of the fund to his estate, or for such other disposition as he desired should be made thereof, in the event that the donee went out of existence, or it became impossible for it to carry on the work of an educational institution. The failure of the donor to attach conditions subsequent to the written proposal may have been due to his belief that the college would always exist as an educational institution at Toledo, Iowa, and that the donation would be preserved sacredly and inviolate by the trustees, and the income therefrom applied in the manner designated by him, forever.

We must, however, deal with the transaction as it appears from the allegations of plaintiffs' petition. Much emphasis is placed by counsel for appellants upon the frequent use of the words "forever" and "never," in the written proposition of the donor. It is urged that they throw light upon his intention. For example, after providing for the report of a committee named in the written proposal to examine securities offered by other donors, to an endowment committee to be appointed by the board of trustees of the college, the instrument proceeds:

"Upon such report being made to the endowment committee, either by the undersigned or by said judges, a meeting of the board of trustees shall be called as soon as is practicable, and said board shall then by proper action, made of record, fully accept said donation of $50,000, with all the terms and conditions on which it is offered, as herein expressed, and *solemnly pledge the college to the strictest compliance with such conditions forever.* * * * The interest arising from said fund of $150,000 shall be used under the direction of said board of trustees as a faculty fund only,—that is, for the payment of president and teachers,—and no part of it shall be diverted to any other use or purpose. * * * The money so raised shall be *forever* held sacred. * * * In order that the trustees may *never* lose sight of the obligation assumed by the college in relation to the said fund, the board shall make provision for the reading

of the permanent conditions hereof on the first day of each regular session and they shall be so read accordingly. '* * * The whole of said sum of $150,000 shall constitute a permanent endowment fund, the principal of which shall be protected and *forever* held sacred as such, and no part of it shall *ever* on any pretense, or in any emergency, be pledged or hypothecated for any purpose, or temporarily or permanently loaned to any other fund of the college * * * and the board of trustees shall establish and continue in *perpetual* operation the proper agency for keeping said fund fully and securely loaned as herein contemplated.''

It is also urged in argument that the donor must have had in mind the provisions of the proposition made by a committee, probably of citizens of Toledo, to another committee of Western College, proposing the payment of $20,194 thereto, upon condition that the same should be permanently located at Toledo by the first day of January, 1881.

No claim is made by plaintiffs or by interveners that the trustees and other officers of Leander Clark College failed in any respect to perform all the terms and conditions of the donation required of them, until after it became impossible to do so, on account of the inability of the officers and friends of the college to provide the necessary funds with which to carry on the business of the institution, and its doors were about to be closed. They do complain, however, of the action of the trustees and other officers of the college, because they closed the doors of the college and disposed of its real estate and terminated its existence as an institution of learning. Both plaintiffs and interveners now contend that the failure of the defendants to continue to maintain and operate the college under the name of the donor constitutes a breach of the contract and the terms and conditions upon which the donation was made; and that because thereof the funds became forfeited, and reverted to the estate of the donor; and that same should be paid to the plaintiff trustees or to the interveners.

We do not agree with the contention of appellants that the sole consideration for the donation was the perpetuation of the name of the donor by making same a part of the official name of the college. That he was moved to some extent by a desire to establish and perpetuate his name in the community where

he had so long resided may be conceded; but this, it seems to us, was clearly not the dominant motive or purpose expressed in the written proposal inspiring his action. By the very terms of said written proposal, the offer was to become void unless the college or its friends raised an additional sum of $100,000. His supreme desire was to secure an adequate endowment for the college.

It appears from the allegations of the petition that $50,000 of the additional $100,000 was donated by Andrew Carnegie, after he had been apprised of the proposed gift of Leander Clark and of the requirement that an additional fund of $100,-000 must be raised, or the offer of Leander Clark would not be carried out.

As appears from portions of the writing quoted above, the donor commended the success of Western College and the opportunity provided thereby to young men and women for an education, who otherwise might not be able to obtain same, and expressed his appreciation of Christian educational institutions. Surely, his dominant purpose was something else than to have his name perpetuated by the college.

It is elementary that charitable trusts will not be permitted to fail if the intention of the creator of such trusts can be carried out, and effect be given thereto. It seems to us that the provision by Leander Clark that the college should bear his name was a mere incident to a broader and more generous purpose: that of assisting to found and perpetuate a fund, to be so invested and managed as to yield an annual income, to be used for the better education of young men and women who might desire to take advantage of the opportunity offered by the maintenance of such an institution as the college in question.

It is true that the written proposal of Leander Clark was carefully worded, and was manifestly phrased with the intention of preventing a diversion of the fund to other purposes of the college, or other misapplication thereof. The use of the words "forever," "never," and other analogous or equivalent words and terms was doubtless intended to make clear, definite, and positive the purpose of the donor with reference to the investment and management of the endowment fund, and the use to be made of the income therefrom by the trustees and officers of

the college, rather than to limit the disposition to be made thereof in the event that the college should, for some reason not within the control of its officers, cease to exist. The language employed must have been used with specific reference to the institution that was to become the immediate beneficiary of his gift. It will be, of course, conceded that he was interested most in having Western College located in his home town, and that he desired it to be perpetually maintained at that place and conducted as an institution; but subsequent conditions made it impossible for the friends of the college to obtain the funds necessary to longer keep it alive. It simply ceased to exist, because it could not continue to carry on its work with the funds available for that purpose. There was no actual or intended breach of the contract by the defendant college or its trustees, nor, as already suggested, was a forfeiture created by the closing of the school, or a resulting reversion of the fund to the estate of the donor. There is no apparent reason why this fund may not be invested, upon proper proceeding in a court of equity, and the income derived therefrom applied to the intended purpose of the donor. We need not undertake to define the powers of a court of equity to deal with charitable trusts, nor discuss at length the cy-pres doctrine. Where it becomes impracticable or impossible to administer a charitable trust according to its terms, a court of equity will assume jurisdiction thereof, and, in the exercise of its broad general powers, direct the trustees to administer the same, or apply the cy-pres doctrine thereto. This doctrine has been adopted by most of the states in the Union (*Russell v. Allen,* 107 U. S. 163 [27 Law. Ed. 397]; *Peth v. Spear,* 63 Wash. 291 [115 Pac. 164]; *Richards v. Wilson,* 185 Ind. 335 [112 N. E. 780]; *Dewein v. Hooss,* 237 Mo. 23 [139 S. W. 195]; *Lackland v. Hadley,* 260 Mo. 539 [169 S. W. 275]; *Catron v. Scarritt Collegiate Institute,* 264 Mo. 713 [175 S. W. 571]; *Stearns v. Newport Hospital,* 27 R. I. 309 [62 Atl. 132]; *People v. Braucher,* 258 Ill. 604 [101 N. E. 944]; *Central Univ. of Ky. v. Walters' Executors,* 122 Ky. 65 [90 S. W. 1066]; *Mason v. Bloomington Library Assn.,* 237 Ill. 442 [86 N. E. 1044]; *In re Estate of Peabody,* 154 Cal. 173 [97 Pac. 184]), and was recently approved by this court (*Hodge v. Wellman,* 191 Iowa 877).

It seems to us clear that the dominant purpose of the gift

of Leander Clark was to establish a perpetual charitable trust for the aid and support of Christian education. The fact that he may have believed that Leander Clark College would exist forever is without controlling importance. He made no provision for a forfeiture or reversion, but instead used language from which we infer a contrary intention.

We have searched the record with care, but find nothing in the allegations of plaintiffs' petition or in the written proposals of the donor to indicate that he used the word "forever" or equivalent words or phrases to express a desire that the fund should revert to his estate if the college should, by unavoidable circumstances or conditions, be forced out of business. The strong restrictive words were used with reference to the administration and use of the entire endowment fund by the college, but one third of which was contributed by Leander Clark.

Counsel for appellants rely, apparently to a considerable extent, upon our holding in *Curtis & Barker v. Central Univ. of Iowa,* 188 Iowa 300. These cases are easily distinguished. In the *Central University* case, one of the conditions of the gift was that the failure of the donee to comply with any of the provisions or conditions of the trust should work a forfeiture of the fund, and that the same would revert to and become the property of the donors, or their heirs, representatives, or assigns. Likewise, counsel for appellees contend that the facts of the case at bar bring it within our holding in *Starr v. Morningside College,* 186 Iowa 790. There is some similarity between the facts of that case and the case at bar. The only question really involved therein, however, was whether the suspension of Charles City College, the donee, and the transfer of the fund to Morningside College, located at Sioux City, worked a forfeiture thereof, or whether, under the terms of the gift, the fund reverted to the estate of the donor. The plaintiffs were his heirs at law. All that is held in that case is that the fund did not revert to the donor or to his heirs. Unless there was a forfeiture and a reversion of the fund, plaintiffs had no interest therein or right to control the disposition thereof.

It would not be profitable for us to review the many authorities cited by counsel for appellants. Suffice it to say that they are either not in conflict with the authorities cited supra

or with our conclusion in this case, or the reasoning of the several cases does not meet with our approval.

It is our conclusion that the dominant motive and purpose of Leander Clark was to make a gift of $50,000 for educational purposes; that the closing of the defendant college was not a breach of any of the obligations assumed by the donee, nor of the terms upon which the gift was made; and that the fund did not revert to the estate of Leander Clark or to his heirs. Whethe* the scheme for the association or merger of Leander Clark and Coe Colleges, alleged so fully in plaintiff's petition, is one that will meet the approval of a court of equity, we are not called upon to decide. Neither plaintiffs nor interveners appear for or in the interest of the public, nor do they seek to have the payment of the fund to Coe College enjoined because it is an improper diversion of the funds, or because the trustees have exceeded their authority in the course pursued. The sole claim of plaintiffs and of interveners is that the fund was forfeited, and reverted to the estate of the donor.  Our conclusion that it did not pass to the plaintiffs, the interveners, or the residuary legatees under the will, disposes of every question properly before us for decision.  It follows, therefore, that, in so far as the court below found and decreed that neither plaintiffs nor interveners are entitled to have or receive the fund in controversy, its decree is affirmed.—*Affirmed.*

STEVENS, C. J., WEAVER, EVANS, and PRESTON, JJ., concur.

FAVILLE and DE GRAFF, JJ., dissent.

FAVILLE, J. (dissenting.)  I feel compelled to dissent from the opinion of the majority in this case.  The case arises on demurrers to the petitions of the plaintiffs and the interveners.

It appears that, prior to 1881, an educational institution known as Western College had been located at the town of Western, in Linn County, Iowa.  About 1881, Western College was removed from Western and "permanently" located at Toledo, Iowa.  In 1902, the authorized officers of the college announced a plan for the raising of an endowment fund for such college, and published·a statement that the college would be given the name of anyone who would give the sum of $50,000 to said endowment fund.  About a year after this written propo-

sition had been promulgated by the college, Mr. Leander Clark, a resident of Toledo, accepted the said offer of the college, said acceptance. containing a counter offer specifying the terms and conditions upon which he would pay to the college $50,000.

His said counter proposition was duly accepted by the proper officers of the college. It is unnecessary that I set out all of the written proposition of Leander Clark, as much of it is quoted in the majority opinion.

He recited that he had had under consideration the. offer of the college to give the name of the college to anyone who would contribute the sum of $50,000 to an endowment fund, and he said:

"I have concluded to accept the proposition made in your resolution above referred to and I hereby propose to lay the foundation for an endowment by making a donation of fifty thousand dollars ($50,000) on the terms and conditions following, to wit: * * *."

Then followed certain conditions and provisions with regard to the payment of the $50,000, and said terms required that the board of trustees of the college "shall then, by proper action made of record, fully accept said donation of fifty thousand dollars ($50,000) with *all* the terms and conditions on which it is offered as herein expressed, and solemnly pledge the college to the *strictest compliance with such conditions, forever.*"

One of the conditions was that the name of the college should be changed to "Leander Clark College," and that such change should be made by proper amendment of its articles of incorporation, "and *forever* thereafter the college shall be known as Leander Clark College."

Another of the conditions was that an additional sum of $100,000 should be raised by the college, and that said sum, together with the $50,000 paid by Mr. Clark, "shall constitute a *permanent* endowment fund, the principal of which shall be protected and *forever held sacred as such.*"

The college officers duly accepted all of the terms and conditions of this offer, as made by Leander Clark. The fund of $100,000 was raised, and Leander Clark paid over the sum of $50,000, in accordance with said agreement. The articles of incorporation of the college were changed, as specified by Mr.

Clark, and the college was named Leander Clark College, and continued to operate as such. In all of these proceedings the college is repeatedly referred to as being located at Toledo, Iowa.

The petitions and amendments thereto in question allege that Leander Clark College and its board of trustees have now made arrangements to merge and consolidate said college with Coe College, a corporation organized under the laws of Iowa and located at Cedar Rapids, Iowa, and to transfer and set over the said endowment fund, including the said $50,000 so paid by Leander Clark, to said Coe College, and have liquidated and permanently closed up the affairs of the said Leander Clark College and transferred said fund and the income derived therefrom to said Coe College, and that Leander Clark College has ceased to exist.

The plaintiffs, as trustees of the estate of Leander Clark, and the interveners, as beneficiaries under his will, seek to recover the said sum of $50,000 so paid to Leander Clark College under said arrangement.

I do not construe this transaction as being a gift or donation by Leander Clark to general educational purposes, and I do not think the cy-pres doctrine has any application whatever to the facts in this case. As I view it, Leander Clark entered into a valid, binding, and enforcible contract with the college, based upon an adequate and sufficient consideration. The primary and essential elements of a contract are all present here. Leander Clark made a written offer to the college. This offer was to pay a certain sum of money to said college, on condition that the said college do certain things. This offer of Mr. Clark's was duly accepted, and a binding contract was made. The essential requirements of the contract were, on the part of Mr. Clark, that he should pay to the college the sum of $50,000; on the part of the college, they were that the name of the institution should be changed from Western College to Leander Clark College, and that the college should be bound by said contract "to the strictest compliance" with the conditions imposed, "forever." The college expressly agreed by said contract that the said sum of $50,000 (together with $100,000 more) should be "forever held sacred," and that the income therefrom should be used as a "faculty fund only: that is, for

the payment of president and teachers; and no part shall be diverted to any other use or purposes.''

As I view it, this was nothing more nor less than a valid, binding, and enforcible contract, entered into between the parties, which was performed on the part of Mr. Clark, and which was necessarily executory as to the college. It required the college to change its name to Leander Clark College, and to maintain the same with ''strictest compliance, forever;'' it required that the fund should be *''forever* held sacred'' as such; it specified the definite purpose for which the income therefrom could be used; and provided that ''no part shall be diverted to *any other use or purpose.''* This was a continuing obligation on the part of the college; and I must confess that I am at loss to see any legal basis upon which the college had a right to violate the terms and conditions of the contract on its part, not only in one particular but in every particular. As I view it, the college has breached every obligation of this contract. It is not maintaining the name of Leander Clark in this educational institution ''forever,'' but has abandoned it entirely; it is not using the income from this $50,000 to pay the faculty of Leander Clark College; it is not holding this $50,000 as a fund which is not to be diverted or used for any other purpose than to support Leander Clark College.

Let us suppose that, the very next day after the college had duly accepted Mr. Clark's offer and had received his money, it had proceeded at once to do the very things it has now done; suppose that, immediately after he had turned over this $50,000, the officers of said institution had changed the name from Leander Clark College back to Western College; or suppose that they had at once decided to abandon the college as an educational institution, and turn this fund over to another educational institution located at some distant point. Would anyone seriously contend that Leander Clark could not, at such time, have maintained an action for the breach of said contract? If so, then it makes no difference that a number of years elapsed before the college breached its contract; nor do I think it makes any difference that in the meantime Mr. Clark has died. It was an executory contract, so far as the college was concerned, which of necessity contemplated the death of

Mr. Clark: in fact, he expressly provided in his offer that, in the event of his death, his heirs and trustees should perform the contract on his part.

I do not care to enter into the discussion of the interesting question as to how far we have recognized the application of the cy-pres doctrine in this state. In any event, I think it has no application whatever to the instant case. Mr. Clark was not giving a general donation to the cause of education that was to be carried out, if need be, by the application of the cy-pres doctrine. He did no such thing. He made a specific and definite written contract with a duly organized corporation, with power to act. By said contract, he bound himself to do certain things; and by said contract, the corporation bound itself to do certain things. The contract was regular in every respect. Mr. Clark performed the contract on his part; the corporation has breached the contract on its part. By the very terms of the contract, the money was paid upon "conditions" which the college bound itself to carry out with the "strictest compliance," "forever." It has not carried out these conditions. It has breached and violated them. It is not at all a question of good faith on the part of the officers of Leander Clark College. No one impeaches their good faith in this transaction. No one questions that possibly the $50,000 can be used to far greater advantage in furthering the general cause of Christian education if turned over to Coe College, or some other larger institution, than if retained by Leander Clark College. It is not a question at all, in my judgment, of whether a greater good may be accomplished by turning the fund over to Coe College. Good faith, a lofty purpose, and a conscientious desire to further the cause of Christian education are in no way involved here. I view this simply as a question of the breach of a contract between two parties. Whether it was capricious or unreasonable on the part of Mr. Clark to require the terms and conditions he desired to be incorporated in the contract, is immaterial to our inquiry. He had a right to make such a contract; he had a legal right to pay $50,000 to have an institution bear his name as a monument and to be preserved "as a sacred trust" "forever." He had a right to require that this money should not be diverted to *any* other purpose, and he had a right to

specify that its income should be used to pay the salaries of the faculty of Leander Clark College. On the other hand, the corporation, created as a legal entity under the laws of this state, had a perfect right to enter into this contract; and, as I view it, it has no more right to breach such a contract than would any individual. It fully and specifically agreed with Mr. Clark that it would do certain things for a valuable consideration. It has breached the contract on its part, and must respond for its failure to fulfill its contract, the same as any individual would do under a similar situation. I cannot interpret this arrangement between Leander Clark and the college as being anything more or less than a simple contract, which has been performed by one party and breached by the other. If there can be no redress and no relief under such conditions, then the law of contracts is very impotent indeed.

It is suggested in the majority opinion that there is no forfeiture clause in the contract, no provision for reversion, and no condition subsequent. I concede that the contract does not, by its express terms, provide for a reversion or forfeiture in the event that the same be breached. I also concede that there was no condition subsequent named in the contract that in terms provided the remedy available if the contract should be breached; but I do not regard these as essential to the right to maintain this action against the college for breach of its contract. The law is not so helpless that it cannot give to a party a remedy for a breach of the terms of an executory contract of this character. It was not incumbent upon Mr. Clark to provide by the contract that he should have his money back if the college breached the terms and conditions of the contract. The law supplies the remedy where the contract is silent on the subject-matter.

I think it sufficiently appears from the petition that the plaintiffs and interveners stand in the shoes of Leander Clark, and are entitled to the remedies available to him had he still been living, and are entitled to maintain this action in the manner in which it was brought, to recover for the breach of the contract on the part of the defendants.

The questions which I have discussed, it seems to me, are too elementary to require citation of authorities. As I view

it, it is largely a matter of the construction to be placed upon the transactions between Mr. Clark and the college. I think these transactions, when properly construed, constitute a valid, binding, and enforcible contract, which has been fully performed on the part of Mr. Clark, and which, according to the allegations of the petitions, has been breached on the part of the defendants.

I cannot acquiesce in the pronouncement of the majority that "it seems to us clear that the dominant purpose of Leander Clark was to establish a perpetual and charitable trust for the aid and support of Christian education." As I view it, he did no such thing. He entered into a perfectly proper and legal contract that he would pay a certain sum of money to a certain corporation for a certain purpose, and the corporation agreed with him that, in consideration of his paying said sum, the specified purpose would be carried out and performed. If Mr. Clark's purpose was to make a gift of $50,000 "as a perpetual and charitable trust for the aid and support of Christian education," then this money can be transported to Hong Kong or "darkest Africa" for educational purposes, and the name of Leander Clark can be utterly abandoned; and if that can be done now, it could have been done the very next day after the college received the money.

Mr. Clark's purpose was clearly defined in his proposition to the college. It was *not* to help the cause of Christian education by turning over a trust fund to certain trustees to administer for said general purpose. The statements in his offer to the college, in my judgment, negative any such idea. I do not think he ever dreamed of such a thing. He was dealing with a local corporation, with the twofold purpose of helping an educational institution in which he was interested and of perpetuating his name as a monument among the people where he lived. He was not making a gift or donation for educational purposes generally. I think it violates the very terms and provisions of the offer and acceptance which make up this contract, to so hold.

I shall not attempt to review the authorities. Nothing in our decisions in any way contravenes the view I have expressed herein. The case of *Curtis & Barker v. Central Univ. of Iowa,* 188 Iowa 300, recognizes that educational institutions are liable

under contracts, the same as other corporations or individuals. Such is and should be the law.

Of the right of the appellants to maintain this action, I have no doubt. The majority do not question such right.

I think the action of the trial court in sustaining the demurrers to the petitions of plaintiffs and interveners was erroneous. I would reverse.

De Graff, J., joins in this dissent.